# EXHIBIT 5

## BEFORE THE LAWYER DISCIPLINARY BOARD
## STATE OF WEST VIRGINIA

In Re:  R. MICHAEL MARTIN, a member of   **Bar No.: 6928**
    The West Virginia State Bar  **I.D. Nos.:** 12-03-335; 12-01-426;
                  13-05-083; 13-06-117; 13-01-204;
                  13-01-217; 13-01-379; 13-01-443;
                  13-01-541; 13-01-552; 14-01-044

## STATEMENT OF CHARGES

To:  R. Michael Martin, Esquire
   Post Office Box 11407
   Charleston, West Virginia 25339

  **YOU ARE HEREBY** notified that a Hearing Panel Subcommittee of the Lawyer

Disciplinary Board will hold a hearing pursuant to Rules 3.3 through 3.16 of the Rules of

Disciplinary Procedure, upon the following charges against you:

1.  R. Michael Martin, Esquire (hereinafter "Respondent") is a lawyer practicing in

  Charleston, which is located in Kanawha County, West Virginia. Respondent, having

  passed the bar exam, was admitted to The West Virginia State Bar on October 2,

  1995. As such, Respondent is subject to the disciplinary jurisdiction of the Supreme

  Court of Appeals of West Virginia and its properly constituted Lawyer Disciplinary

  Board.

## COUNT I
### I.D. No. 12-03-335
### Complaint of Charles F. Runion

2.    On or about July 10, 2008, Complainant Charles F. Runion retained Respondent to represent him after he had an accident at his workplace. Mr. Runion said he signed a Release of All Claims on or about July 13, 2009, but did not receive a "partial settlement" in the amount of $2,000.00 until on or about December 21, 2010. Between January 1, 2011, to August 1, 2011, Mr. Runion said he made numerous attempts to contact Respondent to inquire about the status of his matter but was unsuccessful. Therefore, on or about August 2, 2011, Mr. Runion made a claim with the West Virginia State Bar's Lawyers Fund for Client Protection. As a result of that contact with the West Virginia State Bar in August of 2011, Mr. Runion stated that he received a check in the amount of $8,020.76 and an unsigned and undated "Settlement Sheet" from Respondent indicating that a $22,000.00 check from Zurich Insurance had been received and that Respondent had deducted $6,627.66 for attorney's fee and $18.75 for costs. Further, $15,353.59 had been "withheld to pay providers" and thus, $8,020.26 was due to Mr. Runion.

3.    Mr. Runion provided a copy of the August 22, 2011 letter Respondent had written to Anita Casey, Esquire, in response to notice from the West Virginia State Bar's Lawyers Fund for Client Protection about Mr. Runion's Claim. Mr. Runion was copied on the letter. Respondent advised Ms. Casey that "[w]hile I have received no

specific information as to Mr. Runion's claim, I can report to you that his personal injury claim has been settled and he has now received the proceeds from his claim. The delay in delivering his funds was caused by the workers['] compensation subrogation lien letter not being received, in this office, until late July, 2011. We informed Mr. Runion that because the amount being claimed in subrogation by Brickstreet, the workers['] compensation provider, we could not distribute the proceeds of the settlement until the subrogation formula was applied and the required repayment adjusted and reduced. Again, Mr. Runion has received the proceeds of his claim, including a reduced attorney fee, a full accounting of monies received, and seems satisfied. . . ."

4.  By letter dated November 1, 2011, Brickstreet Insurance (hereinafter "Brickstreet") advised Respondent that it was aware that Mr. Runion's matter had settled in July of 2011. However, to date, it had not yet received payment. Brickstreet requested that Respondent forward payment in the amount of $7,333.33, reduced from the original amount of $35,826.69, in order to avoid having a lien filed against Mr. Runion. Mr. Runion was copied on the letter sent to Respondent.

5.  Respondent did not forward the subrogation payment to Brickstreet.

6.  On or about June 7, 2012, William T. Brotherton, III, Esquire, filed a Notice of Workers' Compensation Lien on behalf of Brickstreet against Mr. Runion in the amount of $35,826.69, the original amount of the subrogation lien.

7.    On or about June 11, 2012, Mr. Runion filed this complaint against Respondent after he was advised that Brickstreet had filed a Notice of the Workers' Compensation Lien against him personally for Respondent's failure to timely pay the subrogation lien.

8.    After receiving two (2) extensions of time to respond, by verified response dated July 19, 2012, Respondent stated that he was "able to procure a liability settlement of $22,000.00, from Liberty Mutual Insurance Company, . . ." He stated that negotiation of a reduction of the Workers' Compensation Lien took longer than he expected and that he reduced his attorney's fee from $7,333.33 to $6,627.00. Respondent said that "[he] received Mr. Runion's check from Liberty Mutual and prior to disbursing funds to the parties, I kept those funds safe in the client trust account, . . . I have confirmed with Brickstreet that they received the check, in the amount of $7,333.33, and have released the subrogation lien, and have forwarded it to the Courthouse for filing."

9.    Respondent also confirmed Mr. Runion's account of his contact with the Lawyers Fund for Client Protection in August of 2011. Respondent stated that he explained that he had just completed the negotiation with Brickstreet for a reduction in the lien, and had only received Brickstreet's subrogation letter on or about July 15, 2011. Respondent stated that when he responded to Ms. Casey's letter, he "honestly believed that we had, in fact, paid Brickstreet the subrogation amount. We had not. I had not seen, nor reviewed Brickstreet's letter of November 1, 2011, indicating that they had not received payment.

10.    Respondent stated that when the matter was brought to his attention though Mr. Runion's complaint, "[he] immediately reviewed Mr. Runion's substantive complaint and forwarded a draft to Brickstreet, in the [reduced] subrogation amount of $7,333.33."

11.    By subpoenaed issued December 11, 2013, the Office of Disciplinary Counsel subpoenaed Respondent's bank records for his IOLTA account, styled on his checks as his "Client Trust Account," and his Operating Account, styled on his checks as his "General Account." Both of Respondent's law office associated bank accounts are located at Branch Banking & Trust (BB&T).[1] Respondent's bank records were subpoenaed for the following dates: April 1, 2010 through December 2013.

12.    Upon information and belief, Respondent's subpoenaed bank records, for the time period of April 1, 2010 through December 2013, do not reflect the deposit of a $22,000.00 settlement check from either "Zurich Insurance" or "Liberty Mutual Insurance Company" received on behalf of his representation of Mr. Runion.

13.    However, Respondent's bank records reflect the following payments to Mr. Runion from Respondent's "Client Trust Account" ending in 9976: (1) Check No. 6517,

---

[1] Upon information and belief, Respondent appears to use his "General" account as both a law office operating account and a personal checking account. The monthly statements for all of Respondent's bank accounts, including the "Client Trust Account" and the "General Account" accounts, are not sent to Respondent's law office address registered with the West Virginia State Bar, rather, all bank statements are sent to what appears to be Respondent's residential address.

12/21/10, in the amount of $2000.00; and (2) Check No. 6752, 8/10/11, in the amount of $8,020.26.

14. Respondent's bank records reflect that on June 29, 2012, Respondent issued a check from his "Client Trust Account" ending in 1968 to Brickstreet in the amount of $7,333.33 on behalf of Charles Runion.[2]

15. Upon information and belief, Respondent's subpoenaed bank records reflect that his apparent pattern and practice for deducting his "attorney's fee" from his "Client Trust Account" for deposit into his "General Account" and his other bank accounts is to employ the use of a telephone transfer. However, due to the manner in which the telephone transfer is reflected on his monthly statements, it is impossible to determine from his subpoenaed bank records from which clients' settlement check Respondent is transferring his attorney's fees and/or the exact amount of the attorney fee he has claimed he earned in relation to any specific client.

16. Upon information and belief, Respondent's subpoenaed bank records do not appear to reflect that he deducted "$6,627.66" as his attorney fee from any settlement he obtained on behalf of Mr. Runion as stated on the unsigned and undated Settlement Sheet.

---

[2] In or about March or April 2012, Respondent's "Client Trust Account" ending in 9976 was "force" closed and his "Client Trust Account" ending in 1968 was opened. However, upon information and belief, as of December 10, 2013, Respondent's IOLTA account registered with the West Virginia State Bar was still listed as the account ending in 9976.

17.   For example, in December 2010, the month in which Mr. Runion received a "Partial Settlement" in the amount of $2,000.00 from Respondent, there are no checks reflecting a payment of an attorney's fee, rather Respondent's "Client Trust Account" reflects the following twenty-nine (29) telephone transfers were made from the "Client Trust Account" to various other of Respondent's bank accounts at BB&T:

| | | |
|---|---|---:|
| PHONE24 TRANSFER TO CHECKING [ENDING 9933][3] | 12-01-10 | 7,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666][4] | 12-02-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666] | 12-03-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-05-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-07-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 3169][5] | 12-09-10 | 1,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666] | 12-10-10 | 21,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-12-10 | 3,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 3169] | 12-13-10 | 2,333.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-14-10 | 6,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 7652][6] | 12-15-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-15-10 | 3,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666] | 12-16-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-16-10 | 2,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-17-10 | 2,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 3169] | 12-17-10 | 1,200.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-18-10 | 2,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] | 12-21-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 3169] | 12-21-10 | 2,000.00 |

---

[3]  The account ending in 9933 is Respondent's "General Account" associated with his law office.

[4]  The account ending in 9666 is identified in subpoenaed bank records as "Personal Interest Checking-MM."

[5]  The account ending in 3169 is identified in subpoenaed bank records as "Elite Gold-MM."

[6]  The account ending in 7652 is identified in subpoenaed bank records as Respondent's Payroll Account associated with his law office.

| | |
|---|---|
| PHONE24 TRANSFER TO CHECKING [ENDING 9333] 12-22-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666] 12-22-10 | 3,333.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-23-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9666] 12-23-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-23-10 | 2,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-24-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-27-10 | 1,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-29-10 | 5,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 9933] 12-30-10 | 4,000.00 |
| PHONE24 TRANSFER TO CHECKING [ENDING 7652] 12-30-10 | 4,000.00 |
| | TOTAL:  $120,866.00 |

18.  Respondent's "Client Trust Account" ending in 9976 had a balance on November 30, 2010, of $220,413.02, two deposits totaling $270,000.00 (included only 6 checks and none associated with Mr. Runion), and an ending balance on December 31, 2010, of $268,624.15.

19.  In addition, to the above-referenced telephone transfers and Mr. Runion's "Partial Settlement" check of December 21, 2010, in the amount of $2,000.00, Respondent also wrote fifty-one (51) other checks in various amounts ranging from $10,604.62 to $200.00 to other clients, including four (4) checks to Christy Scott, Complainant in Count IV, below.

20.  Because Respondent failed to act with reasonable diligence by failing to disburse the subrogation lien owed to Brickstreet Insurance on behalf of Mr. Runion, causing Brickstreet to file a Notice of Subrogation Lien against his client, Mr. Runion, he has violated Rule 1.3 of the Rules of Professional Conduct, which provides as follows:

**Rule 1.3. Diligence.**
A lawyer shall act with reasonable diligence and promptness
in representing a client.

21.    Because Respondent failed to keep Mr. Runion reasonably informed about the status

of the matter so that he could make informed decisions about the representation and

failed to promptly comply with Mr. Runion's reasonable requests for information, he

has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, which

provide as follows:

**Rule 1.4. Communication.**
(a)  A lawyer shall keep a client reasonably informed about
the status of a matter and promptly comply with reasonable
requests for information.
(b) A lawyer shall explain a matter to the extent reasonably
necessary to permit the client to make informed decisions
regarding the representation.

22.    Because Respondent failed to promptly notify Mr. Runion of receipt of funds to

which he was entitled, and failed to promptly deliver to Mr. Runion and Brickstreet

funds to which they were both entitled and which he had in his possession for nearly

two years, he has violated Rules 1.15(a) and 1.15(b) of the Rules of Professional

Conduct, which provides as follows:

**Rule 1.15. Safekeeping property.**
(a)  A lawyer shall hold property of clients or third
persons that is in a lawyer's possession in connection with a
representation separate from the lawyer's own property.  Funds
shall be kept in a separate account designated as a "client's trust
account" in an institution whose accounts are federally insured

9

and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safe guarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person shall promptly render a full accounting regarding such property.

23.    Because Respondent spent or allowed a portion of his clients' funds to be spent on either his own personal matters or other client matters, he failed to properly account for his clients' funds in violation of Rule 8.4(c) of the Rules of Professional Conduct, which provides as follows:

**Rule 8.4. Misconduct.**
It is professional misconduct for a lawyer to:
* * *
(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

24.    Because Respondent failed to promptly deliver to Brickstreet, the subrogation lien in the amount of $7,333.33 to which it was entitled, thus causing Brickstreet to file a Notice of Workers' Compensation Lien against his client, Mr. Runion, and then failed to respond to Mr. Runion's requests for information about the status of payment of

the subrogation lien, until after the filing of a complaint against him, he has engaged in conduct prejudicial to administration of justice in violation of Rule 8.4(d) of the Rules of Professional Conduct, as follows:

> **Rule 8.4. Misconduct.**
> It is professional misconduct for a lawyer to:
> \* \* \*
> (d)   Engage in conduct that is prejudicial to the administration of justice.

## COUNT II
### I.D. No. 12-01-426
### Complaint of David S. Newcomer

25. On or about March 2, 2007, Complainant David Shawn Newcomer was injured in an automobile accident and hired Respondent to pursue a claim on his behalf. Suit was filed against the tortfeasor in the Circuit Court of Kanawha County, West Virginia, on or about March 2, 2009, in a case styled as *David Shawn Newcomer v. Darlene Kay Rose*, Civil Action No. 09-C-358.

26. On or about July 26, 2012, Mr. Newcomer filed a complaint against Respondent alleging that Respondent failed to pursue the matter diligently, failed to return his telephone calls and thus, failed to keep him reasonably informed about the status of his case and failed to explain matters to him so that he could make decisions about the representation.

27. Mr. Newcomer also filed the complaint against Respondent because he had learned that his civil action had been recently dismissed by the Court. With his complaint, Mr.

Newcomer included a copy of a Dismissal Order entered January 24, 2014, pursuant to Rule 41(b) of the West Virginia Rules of Civil Procedure.[7]

28.    After receiving an extension of time to respond, by verified response dated August 27, 2014, Respondent stated that during the pendency of the case, Mr. Newcomer had been incarcerated for two (2) years and only just released sometime in the Spring of 2012. Respondent stated that at that time, he had a discussion with Mr. Newcomer about the status of the case. Respondent maintained that he had been diligently working on Mr. Newcomer's case and had been in negotiations with the insurance companies. Respondent stated that when he met with Mr. Newcomer, he had informed Mr. Newcomer that it was his intention to ask the Court for the reinstatement of his case within applicable time frames. Respondent also stated that he had "properly filed a Motion for Reinstatement" with the Court.

---

[7] Rule 41(b) of the West Virginia Rules of Civil Procedure provides, in part:

*Involuntary dismissal; effect thereof.* – For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication on the merits.

Any court in which is pending an action wherein for more than one year there has been no order or proceeding, . . ., may, in its discretion, order such action to be struck from its docket; and it shall thereby be discontinued. . . . The court may, on motion, reinstate on its trial docket any action dismissed under this rule, and set aside any non suit that may [be] entered by reason of the nonappearance of the plaintiff, within three terms after entry of the order of dismissal or nonsuit; but an order of reinstatement shall not be entered until accrued costs are paid.

29.   A Notice of Dismissal pursuant to Rule 41(b) of the West Virginia Rules of Civil Procedure was filed on or about January 6, 2012.[8]

30.   Despite being served with the Notice of Dismissal in January of 2010, and indicating that he had met with Mr. Newcomer in the Spring of 2012 to discuss the matter, Respondent did not respond or take other action until he filed a "Motion to Reinstate the Action on the Active Docket of the Court" on or about August 24, 2012.

31.   Because Respondent failed to act with reasonable diligence by failing to pursue Mr. Newcomer's civil action in a timely manner, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

32.   Because Respondent failed to keep Mr. Newcomer reasonably informed about the status of the matter and failed to promptly comply with Mr. Newcomer's reasonable requests for information, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

33.   Because Respondent failed to expedite litigation consistent with his client's interest, he violated Rule 3.2 of the Rules of Professional Conduct, which provides:

> **Rule 3.2 Expediting Litigation**
> A lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client.

---

[8] A review of the court record in this matter reveals that Respondent filed a certificate of service on or about November 25, 2009, regarding Plaintiff's Answers to Interrogatories and Request for Production of Documents, and then counsel for the defendant filed an Amended Notice of Deposition on or about February 5, 2010, and then no further pleadings were filed until the Court issued its Notice of Dismissal on January 6, 2012, more than two (2) years after the last pleading in the matter.

## COUNT III
## I.D. No. 13-05-083
## Complaint of Kit Meade

34.  Complainant Kit Meade was involved in an automobile accident in or about February of 2011 and subsequently hired Respondent to represent him in the matter. Mr. Meade said he suffered multiple injuries as a result of the accident and incurred numerous medical bills.

35.  On or about February 25, 2013, Mr. Meade filed this complaint against Respondent stating that while the case had settled in or about July of 2012, he had yet to receive any portion of his settlement funds. He also alleged that Respondent "refused" to respond to his telephone calls inquiring about the status of the matter.

36.  After receiving an extension of time to respond, by verified response dated March 29, 2013, Respondent acknowledged that he represented Mr. Meade in a personal injury matter and that Mr. Meade's case had settled for $25,000.00.[9] Respondent stated that at the time of settlement, he had "to comply with federal regulations requiring that we contact the Medicare office of Centers for Medicare and Medicaid Services ("hereinafter "CMS"), because [Mr. Meade] is Medicare eligible, so that office may

---

[9] From correspondence in Mr. Meade's client file provided by Respondent pursuant to a subpoena duces tecum issued for Respondent's sworn statement on January 14, 2014, it appears that the final settlement amount may have been $37,000.00. The settlement payment was a joint payment between First Century/Farmers and Erie Insurance according to a May 31, 2012 letter from First Century/Farmers in which First Century/Farmers indicated that it would pay $24,679.00 and Erie was to pay $12,321.00. Respondent's bank records indicate a deposit of $24,679.00 from First Century/Farmers into Respondent's "Client Trust Account" ending in 1968 on June 15, 2012.

determine the repayment, or subrogation, required to be paid back to Medicare." Respondent also stated that he told Mr. Meade that his office could not make a full distribution of the settlement until his office received the final lien letter. At the time of his response, Respondent stated that he had yet to receive the final lien letter from Medicare. Respondent also stated that at the time, he asked Mr. Meade if he wanted a "partial disbursement" prior to receiving the "final lien," but that Mr. Meade "indicated that he wanted to wait."

37.    Respondent stated that he had informed Mr. Meade that his office had received the settlement and communicated with Mr. Meade. He indicated that Mr. Meade "was a frequent caller" but that he could not return every call made by Mr. Meade. Respondent also stated that "[he] was still able to make the [partial] distribution to [Mr. Meade] and am happy to do so but that he must comply with applicable federal regulations.

38.    By letter dated August 16, 2013, Mr. Meade stated that the settlement was for $37,000.00 and that Respondent kept $14,000.00 "for himself and gave [Mr. Meade] $6,000.00 as a partial payment, [Respondent] kept $17,000.00 to pay [M]edicare in case [he] owed them any money for medical bills and that was early Spring, April or May." He indicated that "[he feels] that [he] will never get any more of what is owed me."

39.  By letter dated August 20, 2013, Respondent indicated that he had contacted Medicare Secondary Payer Recovery Contracotr (hereinafter "MSPRC") to inquire about a conditional and/or final lien letter that same day by telephone and that he was told that he should receive a letter from Medicare within two weeks. Respondent also confirmed that he had made a partial payment of $6,000.00 to Mr. Meade upon his request.

40.  By letter dated November 15, 2013, Respondent indicated that he had again contacted MSPRC that same day by telephone because he had yet to receive the final lien letter. He was again told that a final lien letter would should be received within twenty (21) days.

41.  By letter dated November 25, 2013, Mr. Meade again advised that Respondent would not respond to his telephone calls inquiring about the status of his matter. In addition, Mr. Meade provided a copy of a Payment Summary Form from MSPRC dated September 18, 2013. The form indicated that the "Sum of Total Charges" was $367.00 and the "Total Conditional Charges" was $63.57. This form also indicates that it was sent to Respondent. Mr. Meade stated that he did not understand why Respondent set aside $17,000.00 for repayment to Medicare.

42.  At his January 14, 2014 sworn statement, Respondent indicated that he had contacted Medicare twice by telephone and that he had his assistant try to get through by telephone as well in an attempt to obtain a final lien letter.

sb050916.WPD

16

43.   Respondent indicated at his January 14, 2014 sworn statement that he was still waiting on Mr. Meade's final lien letter from MSPRC.

44.   By letter dated February 14, 2014, Respondent again indicated, through counsel, that "CMS informed [Respondent] that final lien letters have been issued to Kit Meade . . . . [Respondent] has not received these letters himself.  He will check with the clients to see of they received their copies.  Once the final lien letters are received, [the matter] can be resolved in accordance with the information provided by CMS."

45.   Respondent's written documentation provided by him at his January 14, 2014 sworn statement included a letter from MSPRC dated November 26, 2013, addressed to Mr. Meade and copied to Respondent which indicated that MSPRC had determined that Mr. Meade was required to repay the Medicare Program $38.23 for the cost of medical care it had paid relating to Mr. Meade's liability recovery. The letter also stated that "[t]he Medicare program paid $57.35 for medical care related to your liability recovery. We have enclosed a list of the payments Medicare made related to your recovery with this letter. The Medicare program generally reduces the amount a Medicare beneficiary is required to repay to take into account the costs (such as attorney's fees) paid by the beneficiary to obtain his or her liability recovery. . . . We have applied the formula and determined that the amount you owe Medicare is $38.23." The letter also stated that payment must be received in full by January 24,

2014, or interest at a rate of 10.125% per year would be assessed on any remaining ` balance.

46.    Respondent's written documentation indicates that only two submissions were faxed to Medicare from Respondent's office: (1) on February 16, 2011, a Proof of Representation of Medicare Beneficiary and (2) on November 15, 2013, a Final Settlement Detail Document indicating that matter was settled on June 13, 2013, that the total amount of the settlement was $24,679.00 and that the amount of attorney's fee was $8,226.33.

47.    Because Respondent failed to act with reasonable diligence by failing to obtain the final subrogation lien amount in Mr. Meade's in a timely manner, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

48.    Because Respondent failed to keep Mr. Meade reasonably informed about the status of the matter and failed to promptly comply with Mr. Meade's reasonable requests for information, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

49.    Because Respondent failed to follow through with his obligations to timely obtain a the final lien amount from Medicare on behalf of Mr. Meade until a complaint was filed against him; thus, not making a reasonable effort to expedite litigation consistent with Mr. Meade's interests, he violated Rule 3.2 of the Rules of Professional Conduct, as set forth above.

50.    By failing to promptly deliver to Mr. Meade settlement money to which he was

       entitled to receive, Respondent violated Rule 1.15(b) of the Rules of Professional

       Conduct, as set forth above.

### COUNT IV
### I.D. No. 13-06-117
### Complaint of Ronald & Lori Copley

51.    Lori Copley was involved in an automobile accident on or about October 10, 2006,

       and hired Respondent on or about December 12, 2006, to represent them in a personal

       injury lawsuit. Mr. and Mrs. Copley stated in their complaint filed on or about March

       15, 2013, that Respondent obtained a $150,000.00 settlement on their behalf. They

       stated that they understood that the settlement money was split three ways: $50,000.00

       to them; $50,000.00 to Respondent for his attorney's fee; and $50,000.00 for

       Respondent to use to pay for Mrs. Copley's medical bills. Specifically, they stated that

       this was to include the bills relating to Mrs. Copley's surgery on July 19, 2007.

52.    Mr. and Mrs. Copley filed this complaint when they were advised by Orthopedic &

       Spine Surgery Associates, and a collection agency on behalf of Raleigh General

       Hospital, that Mrs. Copley's medical bills had not be paid and that Mr. and Mrs.

       Copley owed $9,713.90 and $16,185.41, respectively.

53.    After receiving an extension of time to respond, by verified response dated May 10,

       2013, Respondent acknowledged receipt of a settlement of $150,000.00 on the

       Copleys' behalf and that Mrs. Copley had incurred medical expenses in the amount

of $59,815.83. Respondent further stated that "[a]t the time of settlement, [he] had indicated to them that it would take a long time to get a significant reduction in the bills. I fully advised them, and they approved this approach. As a negotiating strategy, often, medical providers will not give their best reduction until the account is placed with a collector. This is what happened in this case."

54.   Respondent also stated that he was able to negotiate reductions in the bills submitted by Orthopedic & Spine Surgery Associates and Raleigh General Hospital.

55.   With his response dated May 10, 2013, Respondent provided copies of two (2) checks dated May 9, 2013, and drawn on his "Client Trust Account" ending in 1968. The first check is to Orthopedic & Spine Surgery Associates in the amount of $9,000.00 and the second one was for Raleigh General Hospital in the amount of $15,000.00.

56.   At his sworn statement on January 14, 2014, Respondent acknowledged that he did not negotiate a reduction of the Orthopedic & Spine Surgery Associates and the Raleigh General Hospital bills until after receipt of the complaint filed against him by Mr. and Mrs. Copley.

57.   Respondent's client file for Mrs. Copley, which was submitted pursuant to a subpoena duces tecum, included copies of checks dated October 2, 2008, and October 15, 2008, drawn on Respondent's "Client Trust Account" ending in 9976, and payable to Lori

Copley and Ronald Copley, for the amounts of $10,000.00 and $40,000.00, respectively.[10]

58. Respondent's client file for Mrs. Copley did not include a "Settlement Statement." However, the client file did include a Medical Expense Report dated June 26, 2008, and which included both the Orthopedic & Spine Surgery Associates and the Raleigh General Hospital bills in the amounts of $9,744.00 and $40,463.53, respectively. The total balance listed was $59,815.83.

59. Because Respondent failed to act with reasonable diligence by failing to disburse the appropriate checks to Mrs. Copley's medical providers in or about June of 2013, which was nearly five (5) years following his receipt a $150,000.00 settlement on behalf of his clients, Mr. and Mrs. Copley, and which was only done after the filing of a complaint against him, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

60. Because Respondent failed to keep Mr. and Mrs. Copley reasonably informed about the status of the matter and failed to promptly comply with their reasonable requests for information about the status of their matter, including their inquiries about

---

[10] Respondent's subpoenaed bank records also include a check dated June 26, 2013, payable to Lori Copley in the amount of $10,000.00, drawn on Respondent's "Client Trust Account" ending in 1968. Because of Respondent's deficient record keeping and his use of telephone transfers from his "Client Trust Account," it is difficult to determine what remains of the $50,000.00 Respondent was allegedly holding in trust to pay for Mrs. Copley's medical providers.

payment of Mrs. Copley's medical bills, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

61.    Because Respondent failed to provide a "Settlement Statement" in this matter, Respondent has violated Rule 1.5(c) of the Rules of Professional Conduct, which provides, in part, as follows:

> **Rule 1.5. Fees.**
>
> \* \* \*
>
> (c) A fee may be contingent on the outcome of the matter for which the service is rendered, . . . . Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

62.    Because Respondent failed to promptly notify Mrs. Copley's medical providers of receipt of funds to which they were entitled, and failed to promptly deliver to Orthopedic & Spine Surgery Associates and Raleigh General Hospital funds to which they were both entitled and failed to disburse any remaining funds left after payment to medical providers which may or may not be due to Mr. and Mrs. Copley and which he has had in his possession for nearly five (5) years, he has violated Rules 1.15(a) and 1.15(b) of the Rules of Professional Conduct, as set forth above.

## COUNT V
### I.D. No. 13-01-204
### Complaint of Lori A. Naylor

63.    In or about May of 2012, Complainant Lori A. Naylor and her husband retained Respondent to represent them in a wrongful death claim on behalf of their four (4) year old daughter. Ms. Naylor filed this complaint against Respondent on May 9, 2013, alleging that he had failed to respond to all but one of her telephone calls to his office requesting information on the status of her case. She also stated that she had only received one letter from Respondent dated September 13, 2012, which indicated that "the insurance company had settled for the liability amount of $25,000.00." During the one telephone call in which she was able to speak to Respondent, he told her that he had yet to receive anything from the insurance company. She said that "[i]f my case has settled for $25,000.00 I want to know why I have not got my money yet."

64.    After receiving an extension of time to file a response, by verified response dated June 7, 2013, Respondent acknowledged that he represented Ms. Naylor in a wrongful death claim on behalf of her daughter. He stated that "[i]t was a complicated claim, wherein the liability insurance carrier initially denied liability. After months of aggressive argument with the carrier, . . ., they relented and agreed to tender the liability coverage of $25,000.00. I have not received those funds yet."

65.    Respondent also indicated that there had been some delay in Ms. Naylor's case due to her delay in completing the process to be appointed as Personal Representative.

Respondent stated that he has set up an appointment for Ms. Naylor to complete the process for appointment.

66. On or about January 13, 2014, Ms. Naylor advised the Office of Disciplinary Counsel that while she met with Respondent on June 26, 2013, and was appointed as her daughter's Personal Representative on that same date, she has not heard anything more from Respondent about the status of her case.

67. By letter dated March 26, 2014, Respondent advised the Office of Disciplinary Counsel that he had received the proposed petition for distribution of the settlement from counsel for the insurance company. He also stated that "[t]his case is further complicated by the fact that Mr. Naylor is incarcerated, and we will probably need to seek a guardian ad litem for him and their other minor children. I am moving this claim forward as quickly as I can . . . . I expect that we should be able to file the Petition, by the first week of April."

68. Respondent's client file for Ms. Naylor includes a letter to Respondent dated February 1, 2013, from Kermit J. Moore, Esquire, counsel for Erie Insurance Company, in which he stated "[o]n December 13, 2012, I wrote to you asking that you provide me with a copy of the Order of Appointment of the Administratrix for the child's Estate and also a list of heirs of the child. I believe I need that information prior to preparing a petition for court approval of the claim and preparation of the order appointing a guardian ad litem."

69.    Respondent's client file for Ms. Naylor received by the Office of Disciplinary Counsel pursuant to his January 14, 2014 sworn statement, does not include any correspondence from him to Mr. Moore.

70.    Respondent's client file includes a letter dated July 24, 2012, from Ms. Naylor terminating Respondent's representation because "I have not had any response from you all in any way."[11] Thereafter, on July 25, 2012, Respondent wrote to Erie Insurance confirming "our telephone conversation, wherein you offered the policy limits in the above-referenced claim. Please tender a draft for the policy limit, payment to Lori Naylor, Personal Representative of the Estate of Gracie Naylor and Michael Martin & Associates, their attorney, without delay." Other than a May 11, 2012 letter to Erie Insurance Company providing notification of his representation of Ms. Naylor, a fax which included the police report sent May 18, 2012, and the July 25, 2012 letter, Respondent's client file provided to the Office of Disciplinary Counsel pursuant to subpoena does not include any other letters from Respondent to Erie Insurance Company. In fact, Respondent received a letter dated August 7, 2012, from Erie Insurance Company in reference to his July 25, 2012 letter in which he was advised that the policy limits were not offered during the July 25, 2012 telephone call. The offer was that "if liability was clear or any questionable liability against [our] insured, that we would be offering limits. However, as [our] investigation is not

---

[11] Respondent also apparently received a second letter dated November 15, 2012, from Lori Naylor which again terminated Respondent's representation.

complete due to waiting for the accident reconstruction report, it is unknown as to whether [our] insured's actions were negligent."

71. By letter dated September 13, 2012, Respondent notified Ms. Naylor and her husband that "Erie Insurance company has tendered its liability policy limit of $25,000.00, as settlement of the liability claim. Additionally, we are pursuing underinsured motorist coverage through your other daughter's policy. That coverage may, or may not be available, based on the facts of the claim. I will advise you once we receive a response from the insurance carrier." However, Respondent's file did not include any other correspondence to any other insurance company.

72. Upon information and belief, Respondent has yet to file "Petition of Lori Landers Naylor, Personal Representative of the Estate of Her Daughter, Gracie Lorraine Naylor, For an Order to Compromise Claim for the Alleged Wrongful Death of Gracie Lorraine Naylor and Distribution of Settlement Proceeds" negotiated in September of 2012.

73. Because Respondent failed to act with reasonable diligence by failing to pursue the filing of the matter for which he was hired by Ms. Naylor and her husband in May of 2012, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

74. Because Respondent failed to keep Ms. Naylor reasonably informed about the status of the matter and failed to promptly comply with Ms. Naylor's reasonable requests for

information, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

75.    Because Respondent failed to follow through with his obligations to timely pursue the filing of the "Petition of Lori Landers Naylor, Personal Representative of the Estate of Her Daughter, Gracie Lorraine Naylor, For an Order to Compromise Claim for the Alleged Wrongful Death of Gracie Lorraine Naylor and Distribution of Settlement Proceeds" on behalf of his client after obtaining a settlement in or about September of 2012, he violated Rule 3.2 of the Rules of Professional Conduct, as set forth above.

**COUNT VI**
**I.D. No. 13-01-217**
**Complaint of Christy L. Scott**

76.    Complainant Christy L. Scott was involved in an automobile accident on or about June 29, 2008, and on or about July 2, 2008, retained Respondent to represent her. On or about May 15, 2013, Ms. Scott filed a complaint against Respondent alleging that he had neglected her case and signed her name to a settlement check without her knowledge.[12] She also provided a copy of an unsigned and undated settlement statement indicating that she received a settlement of $19,500.00, that Respondent took a reduced attorney fee of $3,500.00, and that he was withholding $16,000.00 to "pay providers." The settlement sheet indicated that Ms. Scott had a total of

---

[12]  In his fee contracts signed after 2008, Respondent includes a provision whereby the client "authorize[s] the firm to act as my power of attorney to make deposits of trust funds to hold in trust." However, Ms. Scott's July 2, 2008 Contract for Professional Services does not contain such a provision.

$11,852.64 in medical bills which were not withheld from settlement. There was also a section titled "Checks Previously given to client" with a notation to "Please see attached list" which was not attached to the complaint. She also provided a copy of the front of the $19,500.00 check issued on June 12, 2012, by West Virginia National Auto Insurance Company. The payees were "Christy Scott and Michael Martin, her attorney."

77.   After receiving an extension of time to respond, by verified response dated June 24, 2013, Respondent stated that he represented Complainant, her minor daughter and another individual who were injured in a June 29, 2008 automobile accident. Respondent stated that each party consented to the represented, "in accordance with the Rules of Professional Conduct."

78.   He further stated that "Ms. Scott was informed that West Virginia National offered the policy limit of $20,000.00 per person and $40,000.00 per accident, early in the claim, establishing a virtual escrow of that amount. Ms. Scott was informed and notified when [he] ultimately received the settlement check from West Virginia National, and was fully informed that [he] would keep those funds safely deposited into the trust account in accordance with [Rule 1.5(a) and (b)]. She also understood that she had already received, in an escrowed basis, most or all of the money that she

would receive under the settlement. She is upset with [him] because she received her money early rather than late."[13]

79. At his January 14, 2014 sworn statement, Respondent explained that Ms. Scott was upset because when the settlement check was received, she did not receive any funds from the settlement check as Ms. Scott had requested and received her funds early. He also indicated that he had received "med-pay" and had issued that check to Ms. Scott.

80. Respondent's client file for Ms. Scott, which was submitted pursuant to a subpoena duces tecum, included a complete copy of the unsigned settlement statement. This copy included the "attached list" with copies of a total of thirty-seven (37) checks written to Ms. Scott between the dates of August 20, 2008, through April 20, 2012. These checks total $16,000.00 and were drawn on Respondent's "Client Trust Account" at BB&T. However, Ms. Scott's settlement check was not deposited into Respondent's "Client Trust Account" until on or about April 12, 2012. Morevoer, it is impossible to determine whether Respondent took an attorney's fee in the amount

---

[13] In his verified response, Respondent indicated that the only available third-party liability insurance was $20,000.00 per person, $40,000.00 per accident from West Virginia National Insurance Company. He stated that the West Virginia National coverage of $40,000.00 was tendered early, upon his presentment of the claims. He stated that Ms. Scott's daughter received a full $20,000.00 from West Virginia National; Ms. Scott received $19,500.00 from West Virginia National; and the third person received $500.00 from West Virginia National and $17,000.00 from his parents uninsured motorist carrier, 21st Century, formerly known as AIG Insurance Company. Respondent indicated that Ms. Scott was informed of this division. He also indicated that each claimant suffered more than $7,000.00 in medical expenses. Finally, Respondent stated that he took no attorney's fee in the matter involving Ms. Scott's minor daughter.

of $3,500.00 in this matter due to his use of telephone transfers from his "Client Trust Account."

81.  On or about November 25, 2008, a civil complaint was filed against Ms. Scott in the Magistrate Court of Kanawha County, West Virginia, for failure to pay her medical bills. It was styled *Charleston Area Medical Center, Inc. v. Christy Lynn Scott*, Case No. 08C-3811.

82.  Respondent's client file also includes an undated letter purportedly from Sharren Gailord, who identified herself as Ms. Scott's aunt, and addressed to Respondent. In the letter, Ms. Gailord states that "I know you have given her $2,000.00 already however they were behind on their bills and they needed to be caught up and the car lot wanted $1,500.00 - down and the car insurance monies needed as well. If you could please help her out it would be greatly appreciated . . . If you can help them get a vehicle . . . ."

83.  The list attached to the unsigned and undated Settlement Statement detailing checks issued to Ms. Scott indicates that on or about December 10, 2010, Respondent issued a check to Ms. Scott for $1,500.00 from his "Client Trust Accout" at BB&T. The list indicates that the only checks issued by Respondent to Ms. Scott for $1,000.00 or over that amount occurred with the first check issued to Ms. Scott on August 20, 2008, for $1,000.00; the $1,500.00 check issued on December 10, 2010; and a check for

issued on April 11, 2012, shortly before receipt of the April 12, 2012 settlement check.

84.    Because Respondent failed to act with reasonable diligence by failing to pursue the matter for which he was hired by Ms. Scott in July of 2008, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

85.    Because Respondent failed to keep Ms. Scott reasonably informed about the status of the matter and failed to promptly comply with Ms. Scott's reasonable requests for information, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

86.    Because Respondent used $16,000.00 of either his personal funds or other client funds to make thirty-seven (37) payments to Ms. Scott over the course of four (4) years and prior to his receipt of her settlement funds in April of 2012, Respondent violated Rule 1.8(e) of the Rules of Professional Conduct, which provides as follows:

> **Rule 1.8. Conflict of Interest: Prohibited Transactions.**
> (e)    A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:
> (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and
> (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

## COUNT VII
### I.D. No. 13-01-379
### Complaint of Lyndall V. Mills Fields

87.     Complainant Lyndall V. Mills Fields hired Respondent to represent her shortly after a September 15, 2010 automobile accident which she said occurred while she "was on the job." She stated that a lawsuit was filed and the matter settled in or about March of 2013.[14] However, the workers' compensation carrier, Wells Fargo Disability Management (hereinafter, "Wells Fargo"), had placed a subrogation lien on her settlement. She stated that Respondent had told her that the settlement would be split three (3) ways: $6,666.66 to Respondent for his attorney's fees; $6,666.66 to Wells Fargo; and $6,666.66 to her. Ms. Fields said that Respondent had told her that she would receive her check within a few weeks after the settlement.

88.     Ms. Mills Fields also stated that when Respondent failed to return her telephone calls, she contacted Wells Fargo herself in late July or early August of 2013 and was told that Wells Fargo had received its subrogation check on or about April 11, 2013.

89.     Ms. Mills Fields then stated that she contacted Nationwide Insurance on or about August 7, 2013, and was told that two (2) separate checks were issued on or about March 20, 2013, to one to Wells Fargo in the amount of $6,600.00 and a second check issued jointly in the name of Respondent and Ms. Mills Fields.

---

[14] Respondent filed a lawsuit (Civil Action No. 12-C-182) on behalf of Lyndall Mills and Larry Mills against Roger Lee Maynor in the Circuit Court of Wyoming County, on or about September 14, 2012.

90.     Ms. Mills Fields stated that after speaking to Nationwide, she contacted Respondent again and was finally able to inquire about the status of her disbursement. She stated that Respondent told her that he thought she had already received her check and she told him no she had not received it. She told him that she did not want her check to be mailed to her but instead asked him to contact her to make arrangements for her to come in and get the check personally.

91.     Ms. Mills Fields filed this complaint on or about August 16, 2013, when she never received her check and Respondent failed to return her telephone calls to his office inquiring about the status of the matter.

92.     After receiving an extension of time to respond, Respondent acknowledged by verified response dated September 27, 2013, that he had obtained a $20,000.00 settlement on Ms. Mills Fields' behalf. He stated that she had a workers' compensation lien in the amount of $15,000.00 which the workers' compensation carrier wanted paid in full.[15] Respondent stated that he advised Ms. Mills Fields that "to put money in her pocket, we would have to negotiate the lien." After months of negotiation, Respondent said that the workers' compensation carrier reduced the lien. He also said that he had been trying to recover underinsured motorist coverage. Finally, he stated that Ms. Mills Fields had received her payment and that "[h]e believed her payment and her complaint must have passed in the mail."

---

[15]   Documentation contained in Respondent's client file for Ms. Mills Fields indicates that the subrogation lien amount was $29,004.38.

93.     Respondent's subpoenaed bank records indicate that a check in the amount of
        $13,333.34 and made payable to both Ms. Mills Fields and Respondent and was
        deposited into Respondent's "Client Trust Account" ending in 1968 on or about
        March 29, 2013.[16]

94.     Again, it is impossible to determine whether Respondent took an attorney's fee in the
        amount of $6,666.00 in this matter. There are no checks reflecting a payment of an
        attorney's fee, rather Respondent's "Client Trust Account" reflects that on March 29,
        2013, Respondent or someone on his behalf, made the following telephone transfer
        of funds:

        PHONE24 TRANSFER TO CHECKING [ENDING 9933]   03-29-13     1,666.00

95.     Respondent's subpoenaed bank records indicate that on August 15, 2013, Respondent
        wrote a check drawn on his "Client Trust Account" ending in 1968 in the amount of
        $6,666.66 and was made payable to Ms. Mills Field.

96.     However, Respondent's client file for Ms. Mills Fields did not include a "Settlement
        Statement."

97.     Because Respondent failed to act with reasonable diligence by failing to disburse Ms.
        Mills Fields' portion of her settlement check to her in a timely manner, he has violated
        Rule 1.3 of the Rules of Professional Conduct, as set forth above.

---

[16] This check was deposited with another check to another client in the amount of $13,000.00 for
a total deposit of $26,333.34.

98.  Because Respondent failed to keep Ms. Mills Fields reasonably informed about the status of the matter and failed to promptly comply with her reasonable requests for information about the status of her matter, including her inquiries about his failure to timely disburse of her portion of the March 2013 settlement check, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

99.  Because Respondent failed to provide a "Settlement Statement" in this matter, Respondent has violated Rule 1.5(c) of the Rules of Professional Conduct, as set forth above.

### COUNT VIII
### I.D. No. 13-01-443
### Complaint of Deborah L. Hudnall

100.  Complainant Deborah L. Hudnall retained Respondent in or about November of 2011 to represent her in a personal injury claim following an automobile accident on or about July 22, 2010. Ms. Hudnall asserted that Respondent neglected her matter and failed to respond to reasonable requests for information about the status of her matter between his hiring in November of 2011 and his first contact with her in October of 2012 when he contacted her to advise her of a settlement offer of $20,000.00. Ms. Hudnall said she asked him if he was aware if the settlement offer included her August of 2012 spinal fusion surgery. She said that Respondent said no and that he would get back to her. She stated that he did not contact her again until she sent him a text on or about December 18, 2012, inquiring about the status of the matter. She

said she received a text back that he would telephone her the next day. She said that he did not contact her.

101.    On or about December 28, 2012, Ms. Hudnall said that she received a text from Respondent indicating that a policy limits settlement offer had been made and that he only needed the Medicaid repayment amount to release her funds. She received another text from Respondent on or about January 21, 2013, asking that she come into his office the next day to sign a release. Ms. Hudnall said that she texted him back saying that "I will only sign the release when I collect my funds." She said that Respondent responded back "that they don't have the DHHR lien amount yet."

102.    Ms. Hudnall said that she then contact DHHR/HMS Tort Recovery herself and was advised that they had not been notified by Respondent about the settlement. Ms. Hudnall said that the review of her medical bills took another couple of months and she was then advised that the amount had been sent to Respondent.

103.    Ms. Hudnall stated that she received another text from Respondent on or about February 5, 2013, again asking her to come into his office to sign a release. She said that she then advised Respondent that she had also received SSDI and Respondent's paralegal told her that "they now needed a letter from Medicare for any amounts they may have been paid, and [s]ome people wait over a year."

s0856916.WPD

36

104.  Ms. Hundall said that she called Medicare herself on or about May 30, 2013, to verify

if a "review was being processed." Upon being advised that no process had began, she

said she initiated the process herself.

105.  On or about July 15, 2013, Ms. Hudnall stated she received a letter from Medicare

detailing the amount that needed to be repaid. She said she contacted Respondent on

or about July 16, 2013, to set up an appointment with him to discuss the matter but

she was unsuccessful.

106.  On or about August 2, 2013, Ms. Hudnall sent a certified letter to Respondent asking

for her funds and she included a copy of the Medicare lien letter she had received.

107.  Ms. Hudall said that Respondent contacted her on or about August 12, 2013, and told

her that the lien letter was "conditional and he wants to do what's right by the laws."

108.  On or about September 20, 2013, Ms. Hundall stated that MSPRC "confirms no

communication from attorney and he needs to fax copy of retainer to show

representation." Ms. Hudnall said that she sent Respondent a text advising of this

information.

109.  Ms. Hudnall filed her complaint against Respondent after receiving no further contact

from Respondent about the status of her case and funds.

110.  After receiving an extension of time to respond, by verified response dated October

31, 2013, Respondent acknowledged his representation of Ms. Hudnall in a "clear

liability claim, . . . ." He also stated that Ms. Hudnall's incurred $111,342.66 in

medical expenses that was mostly paid by Medicaid and Medicare. He stated that he was able to "procure a settlement of $20,000.00, liability coverage and $100,000.00 underinsured motorist coverage." Respondent said that he explained to Ms. Hudnall that she would need to create a special needs trust and that the funds could not be distributed to the trust "until we received the final lien letters from both Medicaid and Medicare." Respondent stated that while he had received a conditional lien letter, he had yet to receive a final lien letter from Medicare, and he had not received the final claim amount from Medicaid. Respondent further stated that he had "provided all the documentation to Medicare and Medicaid and complied with federal and state requirements and the Rules of Professional Conduct." Respondent further denied that he failed to act diligently or failed to keep her informed about the status of her matter.

111. Respondent maintained that he has "safeguarded" Ms. Hudnall's settlement funds and because she promptly set up her special needs trust, he is "prepared to forward those funds to her trust upon resolution of this claim, without delay."

112. After reviewing the response filed by Respondent, Ms. Hudnall says that she again contacted DHHR/HMS Tort Recovery and was advised that the final Medicaid amount letter was sent on or about August 5, 2013, and that Respondent had not contacted HMS. She was also advised that MSPRC had not received any documentation regarding his representation from Respondent as had been requested.

Ms. Hudnall said she received a letter dated September 27, 2013, from MSPRC advising that the "liability side of the claim has been closed."

113.    By letter hand delivered to the Office of Disciplinary Counsel on or about January 6, 2014, Ms. Hudnall again detailed her unsuccessful attempts to contact Respondent between late December 2013, and early January 2014. She also provided copies of the August 5, 2013 letter from HMS Tort Recovery indicating that a payment of $6,559.61 would satisfy their lien; a September 27, 2013 letter from MSPRC stating that Medicare did not pay any claims related to her case; and a December 17, 2013 letter from MSPRC stating again that Medicare had not paid any claims related to her case. The same were hand delivered by the Office of Disciplinary Counsel to Respondent at his January 14, 2014 sworn statement.

114.    At Respondent's January 14, 2014, he again stated that he had safeguarded Ms. Hudnall's settlement funds.

115.    By letter dated February 19, 2014, Ms. Hudnall advised Disciplinary Counsel that she had "collected" her settlement funds on or about February 3, 2014. She included a copy of an unsigned and undated Settlement Statement indicated the following receipts and disbursements:

| | |
|---|---|
| Check from Erie Insurance - liability | $20,000.00 |
| Check from Erie Insurance - underinsured | $100,000.00 |
| Total: | $120,000.00 |
| Attorney fee: | $40,000.00 |
| Expenses: | $12.00 |

| | |
|---|---|
| Total Due Firm: | $40,012.00 |
| Withheld to pay providers: | $79,988.00 |
| Medicaid Subrogation: | $4,238.15 |
| Total Settlement: | $75,704.85 |
| Fee to Trust Lawyer: | $1,500.00 |
| Check due client: | $74,204.85 |

116. Respondent's subpoenaed bank records indicate that checks in the amount of $20,000.00 and $120,000.00 and made payable to both Ms. Hudnall and Respondent were deposited into Respondent's "Client Trust Account" ending in 1968 on or about July 12, 2012, and December 13, 2012, respectively.

117. Again, there are no checks reflecting a payment of a $40,000.00 attorney's fee, rather Respondent's "Client Trust Account" reflects that Respondent or someone on his behalf made multiple telephone transfers of funds during the months of July and December 2013. It is impossible to determine from Respondent's bank account records whether he took only a $40,000.00 attorney fee for Ms. Hudnall. For example, between July 12, 2012, and July 31, 2012, there were nineteen (19) telephone transfers from Respondent's "Client Trust Account" to various other of Respondent's accounts occurred totaling $47,265.00. From December 13, 2012, to December 31, 2012, there were thirteen (13) telephone transfers from Respondent's "Client Trust Account" to various other of Respondent's accounts totaling $44,665.00. In addition, following the deposit of Ms. Hudnall's funds into his "Client Trust Account," Respondent deposited other client funds into his "Client Trust Account."

118. Respondent's "Client Trust Account" ending in 1968 had an ending balance on July 31, 2012, of $100,550.33, and an ending balance on December 31, 2012, of $151,713.79.

119. However, Respondent's subpoenaed bank records indicate that the balance on Respondent's "Client Trust Account" ending in 1968 dropped to $14,376.36 on July 31, 2013. Respondent did not disburse Ms. Hudnall's settlement funds in the amount of $74,204.85 until on or about February of 2104.

120. Because Respondent failed to act with reasonable diligence by failing to disburse the portion of Ms. Hudnall's settlement due to her in a timely manner and failed to diligently pursue obtaining the final subrogation lien amounts in Ms. Hudnall's matter, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

121. Because Respondent failed to keep Ms. Hudnall reasonably informed about the status of the matter and failed to promptly comply with her reasonable requests for information about the status of her matter, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

122. Because Respondent failed to promptly deliver to funds to which Ms. Hudnall was entitled and which he had in his possession since July and December of 2012, respectively, and failed to hold those funds separately in a client trust account, he has

violated Rules 1.15(a) and 1.15(b) of the Rules of Professional Conduct, as set forth above.

123.    Because Respondent spent or allowed a portion of his clients' funds to be spent on either his own personal matters or other client matters, he failed to properly account for his clients' funds in violation of Rule 8.4(c) of the Rules of Professional Conduct, as set forth above.

**COUNT IX**
**I.D. No. 13-01-541**
**Complaint of Alicá S. Kincaid**

124.    Complainant Alicá S. Kincaid was involved in an automobile accident in or about May of 2006 and retained Respondent to represent her in the matter on or about June 5, 2006.[17] A lawsuit was filed and she stated that she "had a mediation hearing" on or about June 13, 2013. After the mediation, she stated that she asked Respondent about the timeline for her settlement check to arrive and for him to pay her medical bills. She was concerned because the matter had been pending for a long time already. She stated that after about four (4) to (6) six weeks, she received her check from Respondent and confirmation that her largest medical bill had been paid. Ms. Kincaid stated that shortly thereafter, she contacted Respondent to determine whether her other medical bills had been paid. However, she was unsuccessful in obtaining

---

[17]  Ms. Hayes Kincaid stated that at during Respondent's representation of her, she was known as Alicá Hayes.

information from Respondent so she contacted some of her medical providers herself and was told that Respondent had advised these other medical providers that her case was still pending.

125.   Ms. Hayes Kincaid then contacted Respondent's office again to determine the status of the payments to her other medical providers. She alleged that Respondent's staff never gave her any other information about the status of her case. She filed this complaint on or about November 19, 2013, because she was not able to speak to Respondent about her case despite numerous attempts to contact him and/or find out any more information about whether all her medical providers had been paid.[18]

126.   In a timely filed response dated December 19, 2013, Respondent confirmed that he had represented Ms. Hayes Kincaid in personal injury matter following an automobile accident. He stated that after much delay, her case was settled for $40,000.00. Respondent attributed most of the delay to the fact that the defendant in the matter had sought relief under the Soldier and Sailors Relief Act due to his overseas deployment during the pendency of the civil action. Respondent maintained that he has "kept all of Ms. Kincaid's property safe" and that any delay to finalize the claim was caused by "our efforts to negotiate a reduction in her medical expenses with her healthcare

---

[18] On or about June 27, 2011, Ms. Hayes Kincaid filed an informal complaint with the Office of Disciplinary Counsel seeking help in having Respondent contact her because Respondent was not returning her telephone calls. She also sent Respondent at least two letters, dated May 12, 2011, and September 7, 2011, asking for information about her case and then finally terminating his representation because he failed to respond to her written requests for information about her case.

providers, which she assented to. I am still negotiating with her largest provider." He also maintained that he has kept Ms. Hayes Kincaid informed about the status of her case and complied with her requests for information.

127.  Respondent also maintained that he diligently pursued Ms. Hayes Kincaid's civil action, including obtaining an Order of Default Judgment on or about October 7, 2011. Although, he acknowledged that this occurred prior to his becoming aware that the defendant in the matter had been deployed overseas.

128.  Upon information and belief, Respondent's default judgment was vacated by Order entered on or about October 25, 2012, although a Scheduling Order had been entered in the matter on or about June 28, 2012.[19]

129.  On or about October 24, 2012, defense counsel filed "Defendant's Motion to Strike Plaintiff's Fact and Expert Witnesses," asserting that Respondent's had failed to respond to the defendant's discovery requests which were filed on or about July 5, 2012.[20] Defense counsel also asserted that Respondent failed to disclose any witnesses

---

[19] By letter dated September 17, 2012, from defense counsel, Respondent was reminded that "the agreed order setting aside default judgment was mailed to you for your approval on June 27, 2012. I have not yet received the order. In our conversation last Friday, you indicated your receipt of the order. Please can you review, approve and forward the order to me?"

[20] Upon information and belief, Respondent's discovery responses to Defendant's First Set of Interrogatories and Requests for Production of Documents were not filed until on or about October 29, 2012.

by September 15, 2012, which was the deadline established in the June 28, 2012 Scheduling Order.[21]

130. Respondent's subpoenaed bank records indicate that a check in the amount of $40,000.00 and made payable to both Ms. Hayes Kincaid and Respondent was deposited into Respondent's "Client Trust Account" ending in 1968 on or about June 19, 2013.

131. Again, there are no checks reflecting a payment of an attorney's fee, rather Respondent's "Client Trust Account" reflects that Respondent or someone on his behalf made the following telephone transfers of funds:

PHONE24 TRANSFER TO CHECKING [ENDING 9933][22] 06-19-13    3,666.00

132. In addition, in June 2013, Respondent's "Client Trust Account" also reflects the following closely associated telephone transfers:

PHONE24 TRANSFER TO CHECKING [ENDING 9333]    06-21-13    666.00
PHONE24 TRANSFER TO CHECKING [ENDING 6752]    06-21-13    2,666.00

133. Respondent's "Client Trust Account" ending in 1968 had an ending balance on June 28, 2013, of $80,080.53.

---

[21] Respondent's client file for Ms. Kincaid indicates that he mailed Plaintiff's Fact and Expert Witness Disclosure by letter dated October 19, 2012.

[22] The account ending in 9933 is Respondent's "General Account" associated with his law office.

134.    Respondent's subpoenaed bank records indicate that on August 20, 2013, Respondent wrote a check drawn on his "Client Trust Account" ending in 1968 in the amount of $14,000.00 and made payable to Ms. Hayes Kincaid.

135.    Respondent's subpoenaed bank records indicate that on August 26, 2013, Respondent wrote a check drawn on his "Client Trust Account" ending in 1968 in the amount of $13,000.00 and made payable to Contact Medical Center. The memo line indicates that the check was "for Alicia Hayes."

136.    Respondent's "Contract for Professional Services" with Ms. Hayes Kincaid provides for his compensation for providing legal services to be "33 1/3% of all monies and things of value recovered in a compromise or settlement . . ." which in Ms. Hayes Kincaid's matter would equal approximately $13,320.00. In this matter, the settlement was for $40,000.00, which minus 13,320.00 in attorney's fees would leave approximately $26,680.00 which Respondent should have been "safe guarding" in his "Client Trust Account" on behalf of Ms. Hayes Kincaid. On July 31, 2013, the balance in Respondent's "Client Trust Account" fell to $14,376.36. Respondent did not draft his checks to ($14,000.00) and on behalf ($13,000.00) of Ms. Kincaid until August 20, 2013, and August 26, 2013, respectively. Based upon these calculations, Respondent is no longer holding money in his "Client Trust Account" on Ms. Hayes Kincaid's behalf.

137. Upon information and belief, Ms. Hayes Kincaid's medical expenses exceed $25,000.00.[23]

138. Upon information and belief, Respondent's client file for Ms. Hayes Kincaid does not include a "Settlement Statement."

139. At Respondent's January 14, 2014 sworn statement, Disciplinary Counsel asked Respondent to prepare a settlement statement for Ms. Kincaid. Despite a February 14, 2014 letter from Respondent's counsel acknowledging the request for the same, Respondent has failed to forward a settlement statement for the disbursement of Ms. Kincaid's settlement funds.

140. Because Respondent failed to act with reasonable diligence by failing to disburse the portion of Ms. Hayes Kincaid's due to her medical providers in a timely manner, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

141. Because Respondent failed to keep Ms. Hayes Kincaid reasonably informed about the status of the matter and failed to promptly comply with her reasonable requests for information about the status of her matter, including her inquiries about his failure to timely disburse of the portion of the June 2013 settlement check to her medical providers as she has requested, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

---

[23] According to a January 24, 2007, "Medical Expense Report" located in Respondent's client file for Ms. Hayes Kincaid.

142.   Because Respondent failed to provide a "Settlement Statement" in this matter, Respondent has violated Rule 1.5(c) of the Rules of Professional Conduct, as set forth above.

143.   Because Respondent failed to expedite litigation consistent with his client's interest, he violated Rule 3.2 of the Rules of Professional Conduct, as set forth above.

144.   Because Respondent failed to promptly notify Ms. Hayes Kincaid's medical providers of receipt of funds to which they may have been entitled, and failed to promptly deliver to funds to which the medical providers were entitled and which he had in his possession for since June of 2013, he has violated Rules 1.15(a) and 1.15(b) of the Rules of Professional Conduct, as set forth above.

145.   Because Respondent spent or allowed a portion of his clients' funds to be spent on either his own personal matters or other client matters, he failed to properly account for his clients' funds in violation of Rule 8.4(c) of the Rules of Professional Conduct, as set forth above.

146.   Because Respondent failed to comply with the Office of Disciplinary Counsel's lawful requests for information, he violated Rule 8.1(b) of the Rules of Professional Conduct, which provides as follows:

> **Rule 8.1.  Bar admission and disciplinary matters.**
> [A] lawyer in connection with . . . a disciplinary matter, shall not:
> \* \* \*
> (b) . . . knowingly fail to respond to a lawful demand for information from . . . disciplinary authority, except that this rule

does not require disclosure of information otherwise protected by Rule 1.6.

## COUNT X
### I.D. No. 13-01-552
### Complaint of Betty L. Sydenstricker

147. On or about July 11, 2008, Complainant Betty L. Sydenstricker was involved in an automobile accident and she hired Respondent to represent her on or about December 15, 2009. She stated that she had received a letter from State Farm Insurance (hereinafter "State Farm") requesting verification from her that State Farm had issued a settlement check on her behalf in the amount of $22,000.00 for uninsured motorist coverage on or about May 7, 2010. Ms. Sydenstricker said that after she received this letter, she contacted Respondent about the check because she had not received any money. She said that Respondent told her that "he had to wait for permission from Social Security before he could cash [the check]." However, State Farm had advised her that Respondent had cashed and/or deposited the check in or about May 10, 2010.

148. Ms. Sydenstricker filed a complaint against Respondent when he failed to respond to her November 13, 2013 request for information about the status of her settlement money which she still had never received.

149. In a timely filed response dated December 19, 2013, Respondent acknowledged his representation of Ms. Sydenstricker and that the matter "was favorably resolved" in the amount of $22,000.00. Respondent also stated that he "safeguarded Ms.

Sydenstricker's property and ha[s] not prepared a settlement sheet, because the funds have not yet been distributed, but I have verbally given Ms. Sydenstricker a full accounting of her funds."

150. By letter dated December 30, 2013, Ms. Sydenstricker stated that Respondent recently told her that he was waiting on CMS (medicare) to release the check."

151. At his January 14, 2014 sworn statement, Respondent stated that he was still trying to get information from CMS on Ms. Sydenstricker's behalf and that he had offered her a "partial settlement" but she had refused.

152. By letter dated February 14, 2014, Respondent again indicated, through counsel, that "CMS informed [Respondent] that final lien letters have been issued to . . . Betty Sydenstricker. [Respondent] has not received these letters himself. He will check with the clients to see of they received their copies. Once the final lien letters are received, [the matter] can be resolved in accordance with the information provided by CMS."

153. By letter dated January 8, 2014, but not received by the Office of Disciplinary Counsel until May 24, 2014, Ms. Sydenstricker provided a copy of a January 6, 2014 letter she had received from CMS in which she was notified that Medicare paid no claims on her behalf related to her automobile accident. Respondent was "carbon copied" on the letter. However, she stated that she received a telephone call from Respondent on or about January 7, 2014, asking if she had received a letter from

CMS. Upon her affirmative response, he asked her to read him the contents of the letter and for her to send him a copy of the letter.

154. Respondent's subpoenaed bank records indicate that a check in the amount of $22,000.00 and made payable to both Ms. Sydenstricker and Respondent was deposited into Respondent's "Client Trust Account" ending in 9976 on or about May 5, 2010.

155. Again, there are no checks reflecting a payment of an attorney's fee, rather Respondent's "Client Trust Account" reflects that on May 6, 2010, Respondent or someone on his behalf, made the following telephone transfers of funds:

PHONE24 TRANSFER TO CHECKING [ENDING 9933]    05-06-10    5,000.00
PHONE24 TRANSFER TO CHECKING [ENDING 9933]    05-06-10    1,000.00

156. In addition, in May 2010, Respondent's "Client Trust Account" reflects the following closely associated telephone transfers:

PHONE24 TRANSFER TO CHECKING [ENDING 3169]    05-07-10    1,000.00
PHONE24 TRANSFER TO CHECKING [ENDING 9933]    05-09-10    2,000.00

157. Respondent's "Contract for Professional Services" with Ms. Sydenstricker provides for his compensation for providing legal services to be "33 1/3% of all monies and things of value recovered in a compromise or settlement . . ." which in Ms. Sydenstricker's matter would equal $7,326.00 leaving $14,674.00 which Respondent should have been "safe guarding" in his "Client Trust Account" for the last four (4) years. However, on July 31, 2013, the balance in Respondent's "Client Trust

51

Account" fell $297.64 below what he should have been holding for Ms. Sydenstricker. Respondent's "Client Trust Account" ending in 9976 had an ending balance on May 28, 2010, of $61,085.93. The lowest balance in Respondent's "Client Trust Account," which at the time of deposit of Ms. Sydenstricker's settlement check, ended in 9976, and which at the present time now ends in 1968, between May 28, 2010, and December of 2013, was on July 31, 2013, when the balance dropped to $14,376.36.

158.  Because Respondent failed to act with reasonable diligence by failing to disburse Ms. Sydenstricker's portion of her settlement check to her in a timely manner and failed to diligently pursue a determination of whether there exists a Medicare lien in her matter, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

159.  Because Respondent failed to keep Ms. Sydenstricker reasonably informed about the status of the matter and failed to promptly comply with her reasonable requests for information about the status of her matter, including her inquiries about his failure to timely disburse of her portion of the May 2010 settlement check, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

160.  Because Respondent failed to promptly notify Ms. Sydenstricker of receipt of funds to which she was entitled, and failed to promptly deliver to her funds to which she was entitled and which he had in his possession for at least, four (4) years, he has

violated Rules 1.15(a) and 1.15(b) of the Rules of Professional Conduct, as set forth above.

161.    Because Respondent spent or allowed a portion of his clients' funds to be spent on either his own personal matters or other client matters, he failed to properly account for his clients' funds in violation of Rule 8.4(c) of the Rules of Professional Conduct, as set forth above.

**COUNT XI**
**I.D. No. 14-01-044**
**Complaint of Kelly D. Perkins**

162.    Complainant Kelly D. Perkins hired Respondent to represent her following a June 6, 2009 automobile accident. She stated that the case settled in or about 2011 for $30,000.00 and that she received $7,020.00. She said she thought that Respondent would pay her medical bills out of the remaining balance. However, in September of 2013, she received notice that her Blue Cross/Blue Shield medical bills had not been paid by Respondent. She stated that she contacted Respondent's office to inquire about the status but that he did not return her telephone calls. With her complaint filed on or about January 27, 2014, Ms. Perkins provided a copy of an unsigned and undated Settlement Statement indicating that $6,588.70 had been withheld from her settlement to reimburse Blue Cross/Blue Shield, among $9,781.52 being held by Respondent to repay other medical providers.

163.  After seeking an extension of time to respond, by verified response dated February 24, 2014, Respondent stated his office had attempted to contact the third party recovery unit for Blue Cross/Blue Shield of North Carolina without success and that he tried again to contact them after receiving the complaint but again without success. He stated that "[m]y office indicated to Ms. Perkins, that we were attempting to seek reduction in the subrogation amount to be paid to Blue Cross/Blue Shield of North Carolina. She seemed to be satisfied with our effort and seem to understand our course of strategy. . . . I have safeguarded the client's property and am prepared to distribute the funds upon the final settlement of the subrogation claims, and submit any savings to the client, Ms. Perkins."

164.  On or about June 8, 2010, Respondent deposited Ms. Perkins' $30,000.00 settlement check into his "Client Trust Account" at BB&T. Dr. Ramesh was paid $7,500.00 on or about July 28, 2011, more than one year after receiving the settlement funds.

165.  Upon information and belief, Respondent has neither distributed additional funds from Ms. Perkins' settlement funds in his "Client Trust Account" to any other providers indicated on the Settlement Statement to be paid from her settlement funds nor has he distributed any remaining balance to Ms. Perkins.

166.  Because Respondent failed to act with reasonable diligence by failing to distribute Ms. Perkins' 2010 settlement funds to specified "providers," including but not limited

to Blue Cross/Blue Shield, he has violated Rule 1.3 of the Rules of Professional Conduct, as set forth above.

167. Because Respondent failed to keep Ms. Perkins reasonably informed about the status of the matter and failed to promptly comply with her reasonable requests for information after September of 2013 when she received notice that Respondent had failed to pay her Blue Cross/Blue Shield bills, he has violated Rule 1.4(a) and Rule 1.4(b) of the Rules of Professional Conduct, as set forth above.

168. By failing to promptly deliver to either Ms. Perkins or her medical providers, including but not limited to Blue Cross/Blue Shield, reimbursement money to which they were entitled to receive, Respondent has violated Rule 1.15(b) of the Rules of Professional Conduct, as set forth above.

## AGGRAVATING FACTORS

169. As recognized by Supreme Court of Appeals of West Virginia in Lawyer Disciplinary Board v. Scott, 213 W.Va. 209, 216, 579 S.E.2d 550, 557 (2003), aggravating factors that exist in this matter, include but are not limited to, the following:

    a.   Experience in the practice of law; and

    b.   Pattern and practice of failure to communicate with clients and failure to diligently pursue his clients' interests; and

    c.   multiple offenses.

* * *

Pursuant to Rule 2.9(d) of the Rules of Lawyer Disciplinary Procedure, the Investigative Panel has found that probable cause exists to formally charge you with a violation of the Rules of Professional Conduct and has issued this Statement of Charges. As provided by Rules 2.10 through 2.13 of the Rules of Lawyer Disciplinary Procedure, you have the right to file a verified written response to the foregoing charges within 30 days of service of this Statement of Charges by the Supreme Court of Appeals of West Virginia. Failure to file a response shall be deemed an admission of the factual allegations contained herein.

**STATEMENT OF CHARGES ORDERED** on the 21st day of June, 2014, and **ISSUED** this ___27___ day of June, 2014.

_____
**Charles J. Kaiser, Jr., Chairperson**
Investigative Panel
Lawyer Disciplinary Board